## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 13 2018, 9:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Karen M. Heard
Vanderburgh County Public Defender
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Sean M. Keith,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

November 13, 2018

Court of Appeals Case No.
18A-CR-1129

Appeal from the Vanderburgh
Circuit Court

The Honorable Kelli E. Fink,
Magistrate

Trial Court Cause No.
82C01-1712-F6-7614

**Vaidik, Chief Judge.**

# Case Summary

[1]     Sean Keith represented himself at trial and was convicted of residential entry as a Level 6 felony. He now appeals, arguing that the trial court should have stricken a biased person from the jury, done more to admonish the jury after sustaining an objection, and excluded certain testimony. We affirm.

# Facts and Procedural History

[2]     On the morning of December 7, 2017, Keith's sister, Casey, and her fiancé, Jerry Thompson, were sitting in their house in Evansville, while their two young children slept. While it was still dark outside, Keith came to their house and "was freaked out . . . ." Tr. Vol. II p. 53. Casey and Thompson, who was best friends with Keith, "got [Keith] calmed down." *Id.* At around 7:15 a.m., Casey left for work at KFC, and Keith stayed at the house with Thompson. Once Casey left, Keith's "scaredness came back." *Id.* Thompson later said that he felt "very intimidated" and asked Keith to leave. *Id.*

[3]     After Keith left, Thompson texted Casey, "I believe I [am] fixing to die." *Id.* at 54. Thompson also called his friend and neighbor, Brian McDaniel, and told him that he needed him to come over and stand-by while he got his children ready to go to KFC. Thompson later testified that he wanted "to remove [himself] from the situation so that nothing could progress any further." *Id.* After getting off the phone with Thompson, McDaniel grabbed his handgun and went to Thompson's house.

[4]    Once McDaniel arrived, Thompson put a chair under the knob of the front door and asked McDaniel to keep an eye out for Keith while he began waking up his children and getting them ready to leave. About twenty minutes later, Keith knocked on the front door of the house. Thompson removed the chair and opened the door. After he saw that it was Keith, Thompson quickly shut the door. Almost immediately after Thompson shut the door, the door flew open and Keith came inside the house. When Keith entered the house, he appeared "shifty . . . [and] aggressive" and had a knife in his hands. *Id.* at 56. Keith asked Thompson, "[I]s this your team[?]," and then raised the knife in the air. *Id.* at 57. Once Keith raised the knife, McDaniel drew his gun, pointed it at Keith, and told Keith to leave. Keith backed out the door and left Thompson's house. After Keith left, Thompson, his children, and McDaniel were able to get out of the house and headed straight to KFC. On the way, Thompson called police and met an officer at a nearby gas station.

[5]    After meeting up with the officer and dropping off the children with Casey at KFC, Thompson and McDaniel returned to the house. They were accompanied by police because they were unsure where Keith was. Once at the house, officers took various pictures of the house, including pictures of the damaged door frame. Later, officers located Keith and arrested him. After being read his *Miranda* rights, Keith told officers that "he had tripped out" and that "he had had a knife." *Id.* at 123.

[6]    On December 12, the State charged Keith with residential entry as a Level 6 felony. On March 8, 2018 (the day before his trial), Keith asked to represent

himself at trial because he no longer wanted his appointed attorney to serve as his counsel. The trial court advised Keith of the dangers of proceeding pro se and inquired into his educational background. Ultimately, the trial court granted Keith's request to represent himself. The next morning, the trial court once again warned Keith that even though he was representing himself, he would be held to the same standards as attorneys, "including the rules of trial procedure and the rules of evidence." *Id.* at 4. The trial court also told Keith that his "failure to make proper or timely objections will waive any error for appeal." *Id.* Keith confirmed he understood all the trial court's warnings and that he still wished to represent himself. The trial court then explained the process of voir dire, including that Keith would have five peremptory strikes.

[7] During the State's voir dire, one of the potential jurors expressed an opinion that "so many defendants in our country are under-represented and that punishments are so harsh and there are too many incarcerations in regard to demographics[.]" *Id.* at 32. After this opinion was expressed, the following colloquy ensued:

> The State: . . . Seeing some heads, some. Yes.
>
> Juror:[1] No I'm not responding to that, I'm responding to the fact that my son is a law enforcement officer.

---

[1] The word "juror" is used in the transcript where the potential juror who was speaking was not identified.

The State:      Yes.

Juror:          And has been for 20 years, so I am very pro LEO. I also worked in, I was a nurse in the Marion County Jail for six years, so I might have very skewed opinions on criminal cases, some criminal cases.

The State:      So, based on your experience and the relationship you have with your son and your career, are you going to be able to be fair and impartial to the State and to Mr. Keith?

Juror:          I really can't say that I can be.

The State:      And that's an honest answer, that's all we're looking for. Anybody else feel that way, not necessarily the law enforcement relationship but perhaps a similar relationship to you. [Juror B.], similar idea that you have opinions about the criminal justice system in general and incarceration and that might skew you one way or the other.

Juror:          Separate it, yeah.

The State:      [Juror G.]?

[Juror G.]:     My brother is incarcerated right now for a very long time so, and I don't feel a lot of his, the experience in the court for him was very fair on his behalf.

The State:      So, I'll ask you the same question that I asked of [Juror B.] and I asked of [Juror H.], are you going to be able to separate that experience from what you hear and see in the courtroom today?

[Juror G.]:    I don't know.

*Id.* at 34-35.  After the State finished its questioning of the potential jurors, Keith thanked the jurors for being there but declined to ask any questions. Keith did not use any of his five peremptory strikes or challenge any of the potential jurors for cause.  *See* Appellant's Br. pp. 15-16.  After the State submitted its peremptory strikes, three potential jurors were stricken, and two others were released because they were not needed to empanel the required six-person jury.[2]  Juror B. was seated on the jury, but not Juror G. or Juror H.

[8]     During opening statements, Keith told the jury that "[a] lot of things in these police reports I have contradict [themselves], but the witness Jerry Thompson is in the back, if he says I did it then I'll just say I did it, so that's all I got to say." Tr. Vol. II p. 50.  Thompson testified that Keith's behavior on the morning of December 7, 2017, made him feel "very intimidated" and that he "couldn't see [his] best friend's pupils, [Keith's] eyes were black solid[.]"  *Id.* at 53. Thompson also testified that at the point when Keith's attitude changed, Keith was looking for a firearm.  Thompson also said that after Keith left he texted Casey that he "believe[d] [he] was fixing to die."  *Id.* at 54.  Keith did not make any objections during Thompson's testimony.  McDaniel testified that when Thompson called him to come over, Thompson told him that "he thought [Keith] was trying to kill him, that [Keith] had come by, walked around the

---

[2] For a Level 6 felony, the jury consists of six qualified jurors.  Ind. Code § 35-37-1-1.

house in front of [Thompson's] kids with a knife at his throat." *Id.* at 83. Keith objected to this statement as irrelevant to "[him] coming in the home." *Id.* The trial court sustained the objection and asked the State to ask another question. Shortly thereafter, the State asked McDaniel why he brought his gun to Thompson's house, and McDaniel responded, "Because [Thompson] said that [Keith] had come by with a knife and was threatening to come back and kill him." *Id.* at 84. Keith objected to this statement as irrelevant to the charge of residential entry, and the trial court sustained the objection. After this second objection, the trial court told the jury "to disregard the last portion of the statement and not to consider it, and that would be the portion of the statement indicating the threat to his life." *Id.* at 85. At the conclusion of the trial, the jury found Keith guilty of residential entry.

[9] Keith now appeals.

# Discussion and Decision

[10] Keith makes three arguments on appeal. First, Keith contends that the trial court should have stricken a biased person from the jury. Second, Keith argues that the trial court should have done more to admonish the jury after sustaining his objections to McDaniel's testimony. Third, Keith asserts that the trial court should have excluded portions of Thompson's testimony.

# I. Biased Juror

First, Keith argues that Juror B. was the person who said "I can't really say that I can be" when asked if they could be fair and impartial and that the trial court therefore should not have allowed Juror B. to sit on the jury. *Id.* at 34. Keith did not use any peremptory strikes to remove Juror B. nor did he challenge her for cause. *See* Appellant's Br. p. 16. Recognizing that this resulted in a waiver of the issue for purposes of appeal, Keith contends that the trial court's failure to strike Juror B. constituted fundamental error. Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible. *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014), *reh'g denied.* Stated another way, to prevail under our fundamental-error analysis, the defendant must show that, "under the circumstances, the trial judge erred in not sua sponte raising the issue because [the] alleged errors (a) constitute clearly blatant violations of basic and elementary principles of due process and (b) present an undeniable and substantial potential for harm." *Id.* (internal quotations omitted).

Keith's argument fails from the start because he has not shown that Juror B. was the person who said "I can't really say that I can be" when asked if they could be fair and impartial. Tr. Vol. II p. 34. Keith reasons that Juror B. was the person who said "I can't really say that I can be" because the State identified Juror B.'s by name shortly after this statement was made. The State argues that Keith has not shown that Juror B. was the person who made the

statement showing bias.  The State asserts that Juror B.'s name appears after this statement because the State was turning to Juror B. to hear her opinion on what it means to be fair and impartial, not because Juror B. had just made the statement "I can't really say that I can be."  *See* Appellee's Br. p. 14.

[13] Looking at where this statement appears in the exchange, the State appears to be correct.  Here, again, is the entire exchange:

> Juror:  . . . I'm responding to the fact that my son is a law enforcement officer.
>
> The State:  Yes.
>
> Juror:  And has been for 20 years, so I am very pro-LEO.  I also worked in, I was a nurse in the Marion County Jail for six years, so I might have very skewed opinions on criminal cases, some criminal cases.
>
> The State:  So, based on your experience and the relationship you have with your son and your career, are you going to be able to be fair and impartial to the State and to Mr. Keith?
>
> Juror:  **I really can't say that I can be**.
>
> The State:  And that's an honest answer, that's all we're looking for.  Anybody else feel that way, not necessarily the law enforcement relationship but perhaps a similar relationship to you.  [Juror B.], similar idea that you have opinions about the criminal justice system in general and incarceration and that might skew you one way or the other.

Juror:      Separate it, yeah.

The State:  [Juror G.]?

[Juror G.]: My brother is incarcerated right now for a very long time so, and I don't feel a lot of his, the experience in the court for him was very fair on his behalf.

The State:  So, I'll ask you the same question that I asked of [Juror B.] and I asked of [Juror H.], are you going to be able to separate that experience from what you hear and see in the courtroom today?

[Juror G.]: I don't know.

Tr. Vol. II pp. 34-35 (emphasis added). Read in context, Keith has failed to show that Juror B. made the statement in question because of where and how her name came up in the discussion. Keith has failed to establish fundamental error.

# II. Witness Testimony

Next, Keith argues that (1) the trial court should have done more to admonish the jury after sustaining his objections to portions of McDaniel's testimony and (2) the trial court should have excluded Thompson's description of Keith's eyes as well as his testimony that he felt intimidated, that Keith was looking for a firearm, and that Thompson texted his fiancée that he thought Keith was "fixing" to kill him. Appellant's Br. pp. 18-24. However, Keith did not request any additional admonishment regarding McDaniel's testimony nor did he

object to Thompson's testimony. As such, he has waived review of these issues for the purposes of appeal. *Merritt v. State*, 99 N.E.3d 706, 710 (Ind. Ct. App. 2018). (parties are required to ask for admonishment from the court—not to have the court act sua sponte), *trans. denied*; *see also* Ind. Evidence Rule 105; *Konopasek v. State*, 946 N.E.2d 23, 27 (Ind. 2011) (failure to object to the admission of evidence at trial normally results in waiver).

[15] To avoid waiver, Keith would have to establish that the trial court committed fundamental error. *See Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010), *reh'g denied*. But Keith has not made a fundamental-error argument as to either McDaniel's testimony or Thompson's testimony. *See* Appellant's Br. pp. 16-24. In any event, we do not find fundamental error. First, during opening statements, Keith told the jury that "if [Thompson] says I did it then I'll just say I did it." Tr. Vol. II p. 50. Furthermore, there is substantial other evidence, unchallenged by Keith, that he was acting erratically and violently. Keith was "freaked out" when he first arrived at Thompson's house and became "scared" after Casey left. *Id.* at 53. Then Keith left Thompson's house, came back, and surprised Thompson, who shut the door immediately after realizing it was Keith. Thompson and McDaniel both testified that Keith forcibly opened the door to get inside the house. Thompson testified that once Keith was back inside the house, Keith appeared "shifty . . . [and] aggressive" and had a knife. *Id.* at 56. Photographs taken after the incident showed damage to the door through which Keith entered the house. Finally, after he was arrested Keith told officers that he "tripped out" at Thompson's house and "had a knife." *Id.*

at 123. In light of this evidence, we cannot say that the jury's exposure to some additional evidence of the same sort made "a fair trial impossible." *Ryan*, 9 N.E.3d at 668.

[16] Affirmed.

Riley, J., and Kirsch, J., concur.